UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

03c 11984 RCL

MAGISTRATE JUDGE Bowler

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*ex rel* THOMAS M. ANTONE, IV )<br>Plaintiff )<br>)<br>)<br>*versus* )<br>)<br>McKESSON CORPORATION )<br>)<br>PURDUE PHARMA L.P. )<br>*and* PURDUE FREDERICK COMPANY )<br>)<br>KNOLL PHARMACEUTICALS, LTD )<br>*A Division of* ABBOTT LABORATORIES)<br>)<br>WYETH PHARMACEUTICALS )<br>*formerly known as* WYETH-AYERST )<br>)<br>PFIZER, INC )<br>*and* PHARMACIA CORPORATION )<br>)<br>FOREST PHARMACEUTICALS, INC. )<br>*A Division of* )<br>FOREST LABORATORIES, INC. )<br>)<br>KING PHARMACEUTICALS, INC. )<br>JONES PHARMA INCORPORATED, )<br>*and* )<br>MONARCH PHARMACEUTICALS INC)<br>)<br>NOVARTIS AG )<br>*and* )<br>NOVARTIS PHARMACEUTICALS INC) | Civil Action No:<br><br>_____<br><br><br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. §3730(b)(2)<br><br><br><br><br><br><br><br>AMOUNT $_____<br>SUMMONS ISSUED ____<br>LOCAL RULE 4.1 ____<br>WAIVER FORM ____<br>MCF ISSUED ____<br>BY DPTY CLK ____ |

03-11984 RCL

ROCHE HOLDINGS. INC. )
*and* )
HOFFMAN LA ROCHE INC. )
        Defendants )

AMOUNT $150
SUMMONS ISSUED: Yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
10-10-03

## CIVIL COMPLAINT

### For Money Damages and Civil Penalties pursuant to the False Claims Act, 31 U.S.C §§3729-3733

The United States of America ("United States") by and through Thomas M. Antone, IV, in proper person (the "Relator") brings this action on behalf of the United States and the Relator's own behalf, and says as follows.

### I. Introduction

1. This is an action to recover damages and civil penalties on behalf of the United States of America pursuant to the federal False Claims Act (31 U.S.C. §§3729-3733, hereafter referred to as the "FCA").

2. The FCA provides that any person who knowingly submits a false or fraudulent claim, or knowingly causes a false or fraudulent claim to be submitted to the government for payment or approval for payment is liable for damages of up to three times the amount of the loss sustained by the government, plus civil penalties for each false or fraudulent claim submitted, together with such other and further relief as the Court deems appropriate.

3. The FCA permits any person who has information regarding a false or fraudulent claim being submitted to the government to bring an action on behalf of the

-2-

DOCKETED

government, to join the government as a plaintiff, and to share in the recovery. Plaintiff **Thomas M. Antone, IV** is a person with information regarding the submission of false or fraudulent claims and is referred to herein as "Relator" or "the relator."

4. Pursuant to the FCA and on behalf of the United States of America, Relator seeks to recover for the benefit of the United States Government and the governments of the states, and the District of Columbia, all appropriate damages and civil penalties arising from the presentation of false and fraudulent claims, records, and statements submitted and made to the federal government programs and agencies (including, but not limited to, the United States Public Health Service), their contractors, carriers, intermediaries, and agents, and the state Medicaid programs, their contractors, carriers, intermediaries and agents, collectively referred to herein as the "Governments."

5. The false or fraudulent claims, records and statements that are the subject of this Complaint include, but are not limited to claims submitted for reimbursement of drug products provided to Medicaid recipients; pricing information submitted to the federal and state governments as well as to national compendia such as First Data Bank, RedBook and MediSpan; Medicaid rebate reporting information (including best price and average manufacturer's price) and other information required by the National Rebate Agreement submitted to the Centers for Medicare and Medicaid Services ("CMS"); and National Drug Codes ("NDC") obtained from the Food and Drug Administration ("FDA").

6. Relator seeks to recover all available damages, civil penalties, attorneys' fees, and other appropriate relief as the result of the Defendants' fraud against the Governments.

## II. The Plaintiffs

7. The primary Plaintiff in this action is the United States and programs that it funds pursuant to Title XIX of the Social Security Act of 1939, 42 U.S.C. §1396 et seq., as amended ("Medicaid."); and other agencies and programs it funds through the United States Public Health Service ("PHS"). Relator, also a Plaintiff, is an individual citizen who is self-employed as a consultant to the health care industry, and presently resides in the state of North Carolina. Relator has developed knowledge of the facts alleged herein and the adverse impact that the alleged scheme has upon the Medicaid and PHS programs. The Relator is therefore the original source of this information within the meaning of 31 U.S.C. §3730(e)(4)(A) and (B) and has standing to pursue this case pursuant to 31 U.S.C. §3730(b)(1).

## III. Defendant Repackager

8.a. Defendant **McKesson Corporation** is a corporation organized under the laws of Delaware with its principal place of business in San Francisco, California. It is one of the largest distributors of pharmaceutical products in the United States and originally operated primarily as a wholesaler. In or around 1999, McKesson expanded beyond its original wholesaler function by establishing a large repackaging plant in Memphis, Tennessee as a repackaging division trading as "RxPak, a Division of McKesson HBOC." Through RxPak, Defendant McKesson specializes in repackaging brand-name pharmaceutical products that have generic or therapeutic equivalent competition. Significantly, these repackaged products are distributed to McKesson's retail class of trade in the same manner as its historical products.

8.b. Defendant McKesson advertises its repackaging services for these brand-name products as an "Actively managed program with products that have price spread differential and cost savings benefits" that "enables McKesson to generate cost savings that are a result of price spread differentials that exist between bulk sizes and smaller sizes."

8.c. Defendant McKesson is (or was, for most of the period at issue) the largest wholesaler in the nation, and sells pharmaceuticals to a significant portion of the retail pharmacy industry. Defendant McKesson aggressively promotes its brand name repackaged products in its contracts with large retail pharmacy chains, including Rite Aid, Walmart, and Brooks, seeking exclusive contracts when possible.

8.d. On information and belief, and as supported by McKesson's advertising, the Relator alleges that Defendant McKesson successfully promotes RxPak repackaged products to the retail pharmacy industry by selling the repackaged brand name drugs for significantly less than the comparable product in the manufacturers' original packaging, thus virtually assuring that the pharmacy chains it contracts with will sell primarily or exclusively the repackaged product which competes with the products packaged by the manufacturers themselves. Relator has located retail pharmacies that offer only the "RxPak" product in the popular 100 size bottles for those drugs that are repackaged.

8.e. Defendant McKesson aggressively seeks to buy products from manufacturers for repackaging. On information and belief, the Relator alleges that for many of the drugs named in this Complaint, including Synthroid, Premarin, Levoxyl and Levothroid, the majority of the drugs sold by Defendant McKesson are repackaged, and

McKesson sells relatively few of these products in retail sized (e.g., 100s) bottles that were originally packaged by the manufacturer.

8.f. In or before 2001, Defendant McKesson obtained a wholesaler license for the RxPak facility and registered it as a wholesaler with manufacturers. The RxPak facility therefore ostensibly qualifies as a wholesaler for purposes of calculating the average manufacturer's price within the meaning of the Medicaid Rebate Statute.

8.g. At all times relevant to the allegations in this case, McKesson conducted business within the District of Massachusetts by, among other things, distributing the repackaged brand name pharmaceutical products that are the subject of this suit to retail providers in that District.

8.h. The drugs that McKesson repackages, and which are the subject of the conspiracy and fraudulent activity alleged in this Complaint, are listed on **Exhibit A**. Exhibit A includes both the drugs that are specifically named in this Complaint, as well as other drugs that are repackaged by Defendant McKesson and are not presently the subject of this Complaint. The exhibit is drawn from the listing of drugs repackaged by McKesson on or about May 2003, and is incorporated into and made a part of these allegations.

## IV. Defendant Pharmaceutical Manufacturers

9. Defendants **Purdue Pharma L.P.** and **The Purdue Frederick Company** are privately owned, independent but associated companies. Purdue has its principal place of business in Stamford, Connecticut. At all times relevant to the allegations in this case, Purdue conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged pharmaceutical products,

including **MS Contin,** to retail pharmacies in that District. MS Contin is a synthetic morphine, is an expensive drug, and had high Medicaid utilization during the years at issue in this Complaint. It is a single source drug within the meaning of the Medicaid Rebate Statute as further explained in paragraph 45.

10.a. Defendant **Knoll Pharmaceuticals Ltd,** has been a subsidiary of **Abbott Laboratories** since March 2001, and was previously a division of BASF AG known as Knoll A.G. Abbott Laboratories is an Illinois corporation having its principal place of business in Abbott Park, Illinois. Knoll, Inc. has its principal place of business in the state of New Jersey. These companies are collectively named as defendants and referred to as **"Knoll"** in this Complaint. At all times relevant to the allegations in this case, Knoll conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical products, including **Synthroid, Dilaudid,** and **Vicoprofen.** Knoll also sells K-tab 10mEq and Vicodin to McKesson for repackaging and resale to retail pharmacies in that District. In 2001, Synthroid was the third most-prescribed brand name product in the nation, was and is reimbursed by Medicaid, and is not subject to reimbursement limitations set by the Federal Generic Upper Limit.

10.b. Vicoprofen is reported as a single source drug. Synthroid has been produced pursuant to a New Drug Application (NDA) since July 24, 2002, and thus meets the qualifications of a single source drug as explained in paragraph 42 below. Defendant Abbott is and has been required to report the product as single source drug, and to pay higher rebates on this product associated with its single source status, at least since the issuance of the NDA in July 24, 2002. As of the filing of this Complaint, the

CMS website information on the product reflects that the drug product is being reported to CMS as a non-innovator multiple source product, thus meaning that Abbott is underreporting and underpaying rebates on this product by at least 4.1% of AMP, and perhaps significantly more.[1]

10.c. Relator further alleges that the definition of non-innovator multiple source product would not properly apply to any drug repackaged by McKesson and sold to the Medicaid Program during the years at issue in this complaint, because McKesson did not report an average wholesale price for the product to national compendia for this product.

11. Defendant **Wyeth** is a Delaware corporation having its principal place of business in the State of New Jersey, while its pharmaceutical division (**Wyeth Pharmaceuticals, formerly known as Wyeth-Ayerst**) has its principal place of business in Pennsylvania. It was formerly known as American Home Products Corporation and includes the company formerly known as **A.H. Robins.** These companies are collectively named as defendants and referred to as "**Wyeth**" in this Complaint. At all times relevant to the allegations in this case, Wyeth conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical products, including **Premarin and Ativan.** Wyeth also sells Inderal and Reglan to Defendant McKesson for repackaging and resale to retail pharmacies in that District. Premarin and Ativan are brand name drugs that were frequently prescribed and reimbursed by Medicaid during the years at issue. In 2001 Premarin was the second most-prescribed brand name product in the nation, was and is reimbursed by Medicaid, and is not subject to reimbursement

---

[1] Abbott reports the repackaged Dilaudid as a non-innovator multiple source drug, but reports other strengths as single source products.

limitations set by the Federal Generic Upper Limit ("FGUL"). It is a single source drug within the meaning of the Medicaid Rebate Statute as further explained in paragraph 45. Ativan is an innovator drug within the meaning of paragraph 42, below and is subject to FGUL limitations on reimbursement.

12. Defendant **Pfizer, Inc.** is a Delaware corporation with headquarters in the city and state of New York. It acquired **Pharmacia Corporation** in 2002, which previously marketed the bulk of the products named in this paragraph. These companies are collectively named as defendants and referred to as **"Pfizer"** in this Complaint. At all times relevant to the allegations in this case, Pfizer, Pharmacia and their predecessors conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical products, including **Norvasc and Xanax** that are the subject of this suit to retail pharmacies in that District. Pfizer also sells Aldactazide, Aldactone, Ansaid, Azulfidine, Calan SR, Diabinese, Demulen, Feldene, Glucatrol, Glynase, Lomotil, Micronase, Motrin, Norpace, , Ogen, and Provera to McKesson for repackaging and resale to retail pharmacies in that District. During the years at issue, Medicaid reimbursed all of these drugs. Norvasc and Xanax are reported as single source drugs for Medicaid rebate purposes. Xanax is subject to FGUL limitations, but Norvasc is not.

13.a. Defendant **Forest Pharmaceuticals, Inc.** has its principal place of business in Missouri. It is a subsidiary of **Forest Laboratories, Inc.**, a Delaware corporation with headquarters in the city and state of New York. These companies are collectively named as defendants and referred to as **"Forest"** in this Complaint. At all times relevant to the allegations in this case, Forest conducted business within the District of

Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical products, including **Tiazac, Lorcet** and **Levothroid,** to retail pharmacies in that District. These products are repackaged brand name drugs that were reimbursed by Medicaid during the years at issue. Tiazac is reported as a single source drug for Medicaid rebate purposes. Lorcet and Levothroid are reported as non-innovator multiple source drugs.[2] Tiazec and Lorcet are subject to FGUL limitations on reimbursement.

13.b. Relator further alleges that the definition of multiple source innovator product would not apply to any drug, including Lorcet and Levothroid, that was repackaged by McKesson and sold to the Medicaid Program during the years at issue in this complaint because McKesson did not report an average wholesale price for the product to national compendia.

14.a. Defendant **King Pharmaceuticals, Inc.** is a Tennessee corporation having its principal place of business in the state of Tennessee. It is an owner of pharmaceutical subsidiaries, **Jones Pharma Incorporated** and **Monarch Pharmaceuticals, Inc.** These companies are collectively named as defendants and referred to as **"King"** in this Complaint. At all times relevant to the allegations in this case, King conducted business within the District of Massachusetts through its subsidiaries by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical

---

[2] Generally, this therapeutic class of drug products has been required to obtain FDA approval to ensure manufacturing quality standards. Relator may amend this Complaint to allege Drug Efficacy Study Implementation findings and violations for this product, if appropriate.

products, including **Altace** (through **Monarch Pharmaceuticals, Inc.**) and **Levoxyl** (through Jones Pharma) to retail pharmacies in that District.[3]

14.b. Altace is a single source drug for purposes of the Medicaid Rebate Statute. Levoxyl, however, is presently reported as a non-innovator multiple source product for purposes of the Medicaid Rebate Statute. Levoxyl has been produced pursuant to a New Drug Application (NDA) since May 25, 2001, and Relator alleges that Defendant King has been required to report the product as single source drug, and to pay higher rebates on this product, since the issuance of the NDA on or before May 25, 2001. The CMS website information on the product reflects that the drug product is being improperly reported as a non-innovator multiple source product for the reasons explained above, thus meaning that King is underreporting and underpaying its rebates.

14.c. Relator further alleges that the definition of multiple source innovator product would not apply to any drug that was repackaged by McKesson and sold to the Medicaid Program during the years at issue in this complaint because McKesson did not report an average wholesale price for the product to national compendia.

15.a. Defendant **Novartis Pharmaceuticals Corporation** is the U.S. affiliate of **Novartis AG** and has its principal place of business in the state of New Jersey. These companies are collectively named as defendants and referred to as "**Novartis**" in this Complaint. At all times relevant to the allegations in this case, **Novartis** conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of repackaged brand name pharmaceutical products, including **Brethine** and **Fioricet** to retail pharmacies in that District. Novartis also sold

---

[3] For all or part of the period at issue, King also controlled and marketed Corgard pursuant to a licensing agreement with Bristol Myers Squibb.

Restoril to Mckesson for repackaging and resale to retail pharmacies in that District. These products are brand name drugs that were reimbursed by Medicaid during the years at issue.

15.b. Brethine is reported as an innovator drug product for Medicaid rebate purposes, and Fioricet is reported as a non-innovator multiple source product. Relator further alleges that the definition of multiple source innovator product would not apply to any drug that was repackaged by McKesson and sold to the Medicaid Program during the years at issue in this complaint because McKesson did not report an average wholesale price for the product to national compendia.

16. Defendant **Roche Holdings, Inc.** is a corporation having its principal place of business for its pharmaceutical division, **Hoffman LaRoche Inc.,** in the state of New Jersey. These companies are collectively named as defendants and referred to as **"Roche"** in this Complaint. At all times relevant to the allegations in this case, Roche conducted business within the District of Massachusetts by, among other things, willfully arranging for the sale and distribution of the repackaged brand name pharmaceutical products, including **Klonopin,** to retail pharmacies in that District. Roche also may have sold Bumex, Naprosyn, and Valium to McKesson for repackaging and resale to retail pharmacies in that District These products are brand name drugs that were reimbursed by Medicaid during the years at issue. Klonopin is reported as a single source drug within the meaning of the Medicaid Rebate Statute and is subject to FGUL limits.

17. **Attachment A** to this Complaint lists the above specifically addressed drugs, as well as others that are repackaged by Defendant McKesson and likewise subject to the allegations contained herein. It is incorporated into this Complaint by reference.

18. The Defendant pharmaceutical manufacturers are sometimes collectively referred to in this Complaint as the **Defendant Manufacturers**.

### V. Jurisdiction and Venue

19. This Court has jurisdiction over this matter pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729-3733.

20. Venue in the District of Massachusetts is appropriate under 31 U.S.C. §3732(a). Each of the named defendants have regularly and continuously transacted business in the District of Massachusetts directly and by actively promoting their respective repackaging services and pharmaceutical products to persons and entities within the District, including persons who provide goods and services to Medicaid and PHS program recipients and who bill and are reimbursed by the Medicaid programs for the Defendants' goods and services. Further, Defendants knew and intended that the acts alleged herein, regardless of where they occurred, increased net amounts paid for pharmaceuticals by all Medicaid and PHS programs, including the Medicaid and PHS programs in the District of Massachusetts.

21. A letter outlining a portion of the original information being provided by Relator to the United States was delivered to Assistant United States Attorney Susan Winkler, on behalf of the United States, on or about June 13, 2003. A copy of this Complaint, plus additional written and evidentiary disclosures have been provided to the United States pursuant to Fed. R. Civ. P. Rule 4(d)(1) prior to the filing of this Complaint under seal.

## VI. Duration of Fraud

22. The specific allegations in this Complaint focus on acts that took place between the years 1998 to present; however, Relator also believes and alleges that the Defendants systematically defrauded the Medicaid programs and other federal programs that pay for pharmaceutical products by engaging in the described repackaging scheme prior to 1998. Relator further believes and alleges that the actions of Defendant Manufacturers, wholesalers and repackagers are continuing to defraud Medicaid and other federal programs, and that significant damages will continue to accrue to these programs until the Defendants are held accountable through restitution, multiple damages, and penalties.

## VII. Overview of the Repackaging Scheme

23. Repackaging of pharmaceutical products dramatically increased following, and as a result of, the passage of the Medicaid Rebate Statute in 1990. Relator acknowledges that some repackaging of pharmaceutical products (e.g., packaging to facilitate a physician's in-office dispensing, where allowed by law) serves a legitimate business purpose. On the other hand, manufacturers and repackagers have also found various ways to inflate government reimbursement, reduce Medicaid rebate obligations, and defeat the statutory preference for less costly generic drugs by using repackaging to hide the true prices of the products being distributed to Medicaid recipients. While some elements of the repackaging effort may be analogous to tax 'avoidance,' other elements are deliberately intended to conceal discounts and mislead government regulators in such fashion as to raise the activity to the level of fraud. This more sinister manipulation is

accomplished by false and/or deceptive NDC labeling, deliberately understated rebate information, and reporting false wholesaler acquisition cost information.

24. The repackaging efforts addressed in this Complaint do not appear to serve any mitigating legitimate business purpose for the manufacturer, repackager, or retailer. Repackaging in this context is nothing more than a useless additional processing of drug products that commenced after passage of the Medicaid Rebate statute and subjects the drugs to potential adulteration through additional exposure to light, air, and heat. The end result of the processing is the same pills, in the same package sizes, bearing the same identifying information (NDC) as product that is packaged by the manufacturer. The repackaged product is then introduced (at a discount) into the retail marketplace to compete directly against the products packaged by the manufacturer itself.

25. For some of the drugs discussed in this Complaint, virtually all product distributed by wholesalers to the retail marketplace is repackaged product. The sole purpose of the repackaging is to perpetrate a scheme to defraud the government programs.

26. Repackaging, coupled with false price reporting to national compendia, inaccurate and misleading use of the National Drug Code identifying information, and inaccurate rebate reporting effectively conceals the significant wholesaler discounts and additional post-retail rebates from Medicaid, and results in hundreds of millions of dollars per year in losses to the governments in two major ways: First, the governments have relied upon the manufacturers' reported wholesale acquisition cost ("WAC") as accurate, and have grossly overestimated reimbursement needed to approximate estimated acquisition cost ("EAC"). They have thus overpaid retail pharmacies, as a

direct result of the same type of fraud as has been alleged and, in some cases established, in the average wholesale price ("AWP") cases involving injectable drugs.

27. Second, and depending upon the algorithm involved in the calculation of Medicaid rebates for the particular drug product,[4] Defendant Manufacturers overstate BP (and thus may underpay Medicaid rebates) by failing to consider both the discounts offered to wholesale repackagers and any chargebacks and/or post-retail rebates offered to insurers who reimburse the product when calculating their best price to the commercial public.

### VIII. Selected Statutory and Regulatory Background

28. The Governments are responsible for administering a detailed statutory and regulatory schemata intended to ensure that Medicaid receives the benefit of available cost saving measures such as generic drugs and the full array of discounts, chargebacks and post-retail rebates routinely offered by manufacturers.

29. As discussed more fully in this Complaint, the Defendants conspired to illegally circumvent, and did illegally circumvent, certain specific statutory and regulatory requirements as well as defeat the general intent of the Medicaid Rebate statute. The following summary of statutory and regulatory requirements, industry practices, and definitions are an important predicate to the allegations that are at the heart of this Complaint.

---

[4] Manufacturers are incentivized to include all discounts in their reported average manufacturers price ("AMP"), because it lowers the Medicaid rebates due. For those drugs that are multiple source generic products paying rebates at a simple 11% of AMP, all or most of the government's losses are measured as a result of the overstatement of WAC. For single source and innovator products, the government's losses may also include the Defendant Manufacturer's failure to pay full and accurate Medicaid rebates.

### *National Drug Codes; Reimbursement Formulae*

30. Manufacturers, national compendia, and Medicaid use National Drug Codes (NDC) in order to identify the precise drug product, strength, and the size of the bottle purchased by the retailer that dispenses the drug. The NDC system was designed to aid reimbursement at the request of CMS (then HCFA) and is administered by the Food and Drug Administration (FDA).

31. Upon request by a manufacturer or repackager,[5] the FDA assigns an 11-digit NDC that describes the manufacturer or repackager (the first five digits, which is unique to the manufacturer or repackager and is referred to as the "labeler code"); the drug product and its strength (typically, the middle four digits) and the size of the bottle or other specific dispensing means (typically, the last two digits.)

32. Manufacturers and repackagers are required to register with the FDA and receive a labeler code. They are also required to register the drugs they manufacture or repackage with the FDA.[6]

33. Manufacturers and repackagers are not required to place the NDC on the drugs they package, but if they do so, they must comply with the provisions of 21 C.F.R. §207.35, which does not appear to lawfully permit a manufacturer or repackager to use an NDC other than the one assigned to the manufacturer or repackager pursuant to the FDA registration and listing processes.

34. The NDCs used by the manufacturers and repackagers to report the price information and to process the Medicaid and PHS claims for reimbursement are different and distinct for each manufacturer, drug, strength, and bottle size. Medicaid, PHS and

---

[5]  The FDA defines "manufacturers" as including repackagers. See 21 U.S.C. § 207.3(a)(8).

other insurers rely upon the NDCs to distinguish between brand name and less costly generic products, and to identify any unique characteristics relating to the drug's origin and packaging that are relevant to establishing reimbursement.

### *The Medicaid Programs' Payments for Brand Name and Generic Drugs, and The Federal Generic Upper Limit*

35. States are not required to offer pharmaceutical drug benefits to Medicaid recipients, but all do. The federal government provides federal financial participation (FFP) in accordance with specific regulations that limit FFP if the state Medicaid programs spend more for both brand name and generic drugs than is reasonably necessary.

36. 42 C.F.R. § 447.331 (a) requires states to reimburse pharmaceutical products at estimated acquisition cost (EAC), plus reasonable dispensing fees. FFP for drugs that have generic equivalents within the meaning of the regulation are subject to a calculated upper payment limit, referred to as the Federal Generic Upper Limit (FGUL).

37. All states and the District of Columbia have generic preference laws or regulations. Most require retail pharmacies to dispense generic products whenever the prescription does not specifically indicate that the brand name product is necessary for the health and well being of the Medicaid recipient. Generic drugs that are not subject to the FGUL[7] are usually reimbursed using the same formulae as brand name or innovator drugs.

38. The Defendants know that state Medicaid programs arrive at EAC using the price of sales to wholesalers as reported by the manufacturers to national compendia,

---

[6] See, generally, Part 207 of Title 21 U.S.C.

frequently referred to as wholesaler acquisition cost ("WAC"), or Direct Price ("DP"). Many states use average wholesale price ("AWP"), which is a derivative of WAC. First Data Bank (FDB), the compendium used by many state Medicaid programs, presently calculates AWP using the manufacturer-reported WAC.[8] The Defendants know that Medicaid relies upon WAC, AWP, and DP to establish reimbursement for the Defendant Manufacturers' drug products. The FGUL is also calculated by CMS using manufacturer-reported prices.

39. WAC is clearly understood to be a number capable of exact measurement by reference to the *actual* sales price to wholesalers. It is neither an "estimate" nor a "sticker price" when used in the context of pills that are distributed through wholesalers. AWP is reported to the states by First Data Bank at 20% to 25% greater than WAC for the drugs in this Complaint. States using AWP as a measure of reimbursement for drugs that pass through wholesalers have notice of both the reported WAC and the formula used to compute AWP from WAC.[9] Thus, if WAC is falsely inflated, the AWP will also be overstated. When discussing price reporting in this Complaint, Relator refers to unlawful price inflation as overstating WAC. However, Because of the linear relationship between AWP and WAC, any false statement or deception regarding WAC will affect states that use AWP in similar proportion and fashion.

---

[7] Drugs may not be subject to the FGUL in cases where there are too few generic equivalents. In addition, drugs like Synthroid preceded the establishment of the Orange Book and are excluded from the rating system because they are "grandfathered."

[8] FDB provides electronic information that permits the states to process Medicaid drug reimbursement. For most or all of the period at issue in this Complaint, AWP as reported by FDB is WAC + 25%.

[9] The linear relationship between WAC or DP and AWP is more widely published and more reliable for drugs sold through full line wholesalers than for injectable, biological, and inhalant products. For this case, where the bulk of the products are sold to wholesalers (WAC) or directly to retail pharmacies (DP), it distracts from the issues for Relator to quibble over the definition and reasonableness of AWP.

40. In the absence of intent to deceive or defraud, sales by manufacturers to wholesalers are invoiced at the manufacturer's reported WAC or DP, and are paid by the wholesalers at WAC less a 2% cash discount for prompt payment. The drug products sold by wholesalers to retail pharmacies are in turn sold at WAC plus a small, additional service charge. For this reason, the governments have reasonably relied upon WAC as a good initial measure of EAC. Recognizing that the drugs sold to retailers at WAC may be subject to yet additional discounts in the form of chargebacks, and post-retail rebates that are paid directly from the manufacturer to the insurer that reimburses the retail pharmacy, Congress implemented the Medicaid Rebate Statute in 1990 with the intent of capturing similar discounts for the state Medicaid programs. 42 U.S.C. §1396r-8 (the "Act.") In 1993, Congress extended the pricing benefits of the 1990 Medicaid statute to PHS programs.

### *The Medicaid Rebate Statute*

41. The Act requires manufacturers to pay rebates on drugs, and differentiates between those that are marketed pursuant to a New Drug Application (NDA), and those for which there are two or more drug products that are rated pharmaceutically equivalent by the FDA, are bioequivalent, and are sold or marketed in the State during the rebate period (referred to herein as "multiple source drugs.")[10] In order to be considered a drug that is 'sold or marketed' to qualify for the lower rebate category, the drug must appear "in a published national listing of average wholesale prices."[11] While McKesson's repackaged drugs are for the most part listed with the FDA as individually manufactured

---

[10] 42 U.S.C. §1396r-8(k)(7)(A).
[11] 42 U.S.C. §1396r-8(k)(7)(C)(iii).